1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                            21 CR 246(RA)

5   ADRIANO RODRIGUEZ-DIAZ,

6              Defendant.

7   ------------------------------x

8                                     New York, N.Y.
                                      January 17, 2023
9                                     9:15 a.m.

10  Before:

                        HON. RONNIE ABRAMS,
11
                                      District Judge
12
                            APPEARANCES
13

14  DAMIAN WILLIAMS,
        United States Attorney for the
15      Southern District of New York
    BY:  DANIELLE M. KUDLA
16       MITZI STEINER
         Assistant United States Attorneys
17
    ERNESTO CERIMELE
18      Attorney for Defendant

19  -and-

20  HENRY KLINGEMAN
        Attorney for Defendant
21
    Also Present:
22
    ERIKA DE LOS RIOS, Spanish Interpreter
23  Jill Hoskins, Spanish Interpreter

24

25

1        (Case called)

2        DEPUTY CLERK:  Counsel, please state your name for the

3    record.

4        MS. KUDLA:  Good morning, your Honor.  AUSA Danielle

5    Kudla and AUSA Mitzi Steiner.

6        THE COURT:  Good morning.

7        MR. CERIMELE:  Earnesto Cerimele and Henry Klingeman,

8    on behalf of Adriano Rodriguez-Diaz.

9        THE COURT:  Thank you.  You May be seated.

10       I note Mr. Rodriguez-Diaz is being assisted by a

11   Spanish interpreter.  If at any time you have trouble

12   understanding anything that's happening in this proceeding,

13   either for the language barrier or any other reason, please let

14   me know.

15       THE DEFENDANT:  Yes.

16       THE COURT:  So we're here for sentencing.  Of course,

17   Mr. Rodriguez-Diaz pled guilty in July to participating in a

18   conspiracy to import cocaine in violation of 21 United States

19   Code Section 963.  But before -- well, a couple things.

20       So there are, of course, a number of disputed issues

21   that we had a Fatico hearing about.  I'm going to state my

22   findings for the record.

23       I will note, though, that on each of those issues, I

24   agree with the government, and I think it has proven each of

25   the contested issues by a preponderance of the evidence.  So

1    I'm going to state my reasoning for that in a moment.  But I

2    want to talk about the obstruction of justice issue before I

3    state my reasoning with respect to the disputed issues of the

4    Fatico hearing.

5         So as the parties are aware, the government is

6    requesting an enhancement pursuant to guidelines provision

7    3C1.1 for the defendant's alleged attempts to obstruct justice

8    or intimidate a cooperating witnessing and his family members.

9         I have read all the supplemental letters, but I still

10   do have a number of questions for the parties.  I want to start

11   with defense counsel, and then I'll turn back to the

12   government.

13        You said in one of your letters that these facts are

14   disputed, but it wasn't clear to me exactly what you're

15   disputing.  Are you disputing that there was a phone call that

16   the defendant made to CW1's brother, or are you disputing the

17   substance of the call?  Or is it just kind of who approached

18   who first and exactly whether a direct threat was made.  It

19   just wasn't entirely clear to me what you were disputing.

20        MR. CERIMELE:  Yes, your Honor.  We dispute

21   everything.  On the one hand, we dispute that the call

22   occurred.  On the other hand, we dispute that it occurred.

23   Even if it did occur, it occurred as the government suggested

24   it did.  So we don't stipulate or agree that it happened at

25   all.

1    THE COURT:  All right.  And you haven't submitted any

2    kind of affidavit or anything else on behalf of your client?

3    MR. CERIMELE:  No, your Honor.  Certainly, it's not

4    our burden to produce.

5    THE COURT:  I'm not suggesting it is, but I just

6    wanted to be clear.

7    All right.  Let me just turn to the government.

8    So, of course, I can rely on hearsay at sentencing,

9    but I also have to ensure that the hearsay is reliable.  I

10   mean, I don't have any particular reason to doubt that this

11   happened and that there is corroboration of calls being made

12   and of the phone being found in a cell, but why is it that you

13   didn't get an affidavit from the brother or that you aren't

14   seeking to call the brother -- even if he couldn't come here,

15   if he's unavailable to come here, remotely?  Why is it that

16   this needs to be by way of hearsay?

17   MS. KUDLA:  Your Honor, I think it was primarily in

18   light of the timing for which these facts have come up.  And at

19   the point that -- this was right before the hearing when we

20   learned this evidence and then obtained it shortly before the

21   holidays.  And I think at that point, certainly, we felt that

22   we had met our burden, which was preponderance of evidence

23   based on the corroboration from the cell phone records, the

24   fact the cell phone had been called there.  We had disclosed in

25   discovery to defense counsel the contemporaneous text message

1    that was received from the brother saying, I can't believe this

2    is happening.

3            And we felt like in light of that, your Honor, the

4    corroboration of the evidence of these statements was

5    sufficient on the burden that we were putting forward.  And the

6    witness also, as noted, is in the Dominican Republic, so I

7    think that complicated the matters.

8            THE COURT:  Is there any reason that you couldn't --

9    just because the defendant is contesting this and because the

10   witness could be made available, even if only remotely, I'm

11   inclined to give you a choice of either adjourning this

12   proceeding and either submitting an affidavit or ideally

13   calling this witness, even if it's remote, unless there's any

14   objection to having that witness called remotely, I think, or

15   my denying the request to apply this enhancement.

16           MS. KUDLA:  Your Honor, if I just may have one moment

17   with my colleague?

18           THE COURT:  Sure.  Take your time.

19           (Counsel confer)

20           MS. KUDLA:  Your Honor, I think in light of the length

21   that this case has been pending and all of the information that

22   has been put forth before your Honor, which is at the Fatico

23   hearing itself through witness testimony, I think it's in the

24   best interest to proceed to sentencing today.

25           THE COURT:  Okay.  Understood.

1          And for the reason that I just stated, I'm going to

2     deny the request to apply the obstruction of justice

3     enhancement.  I found it very concerning, I have to say, and I

4     think it's a really a close question as to whether the

5     government has met its burden.

6          As I noted, the government is permitted to consider

7     hearsay at a sentencing, but there have been cases where the

8     Second Circuit has found district court's reliance on hearsay

9     to be improper.  And so I'm going to deny that request to apply

10    the enhancement, and I'm not going to consider that conduct

11    today.

12         So with that said, why don't I make my rulings with

13    respect to the other contested enhancements from the Fatico

14    hearing?

15         To reiterate for the record, there are four

16    enhancements in dispute.  One, whether a drug weight of

17    310 kilograms of cocaine is attributable to the defendant

18    pursuant to guideline provision 2D1.1a(5) and c(2); two,

19    whether a firearm was possessed pursuant to 2D1.1b(1); whether

20    the defendant maintained a premise for purposes of distributing

21    narcotics pursuant to 2D1.1b(12); and whether the defendant was

22    an organizer or leader of this narcotics conspiracy pursuant to

23    3B1.1a.

24         There's a related dispute as to whether Mr. Rodriguez

25    is safety valve eligible, which I'll address, and conclude that

1    he is not in light of my findings with respect to his role and

2    with respect to the firearm possession.

3            So, first, I find that the 310 kilograms of cocaine is

4    attributable to Mr. Rodriguez-Diaz.  It's well established that

5    a narcotics conspiracy, the quantity of drugs that was

6    reasonably foreseeable to the defendant, is attributable to

7    him.  And at the Fatico hearing, the government presented

8    credible evidence that that amount of cocaine was reasonably

9    foreseeable to him.

10           In particular, we heard extensive testimony from a

11   cooperating witness, testifying under the pseudonym Jose Diaz,

12   about how this drug smuggling conspiracy operated and the

13   amount of cocaine that was imported in each shipment.  Mr. Diaz

14   testified that Mr. Rodriguez-Diaz directed the operations at

15   the Sweet Produce warehouse, which acted as a front for

16   importing cocaine.

17           According to Mr. Diaz, Mr. Rodriguez-Diaz was the one

18   who arranged the shipments with his contacts in the

19   Dominican Republic.  Mr. Rodriguez-Diaz was present when the

20   shipments were delivered to the warehouse, usually concealed in

21   shipments of liquid sugar.  Mr. Rodriguez-Diaz was the one who

22   identified the boxes and the shipment that contained cocaine,

23   and Mr. Rodriguez-Diaz directed Mr. Diaz and other warehouse

24   employees to unload the cocaine and transport it to a cigar bar

25   for further distribution.

1        Mr. Diaz further testified that between December 2019

2   and March 2021, the Sweet Produce warehouse received at least

3   five drug shipments, totaling 310 kilos.  The breakdown was

4   approximately 60 kilograms in the first shipment, 40 in the

5   second, 90 in the third, and then 120 that were seized by DEA

6   agents in March of 2021, which was spread across two shipments.

7        I found Mr. Diaz to be credible, and I conclude that

8   the government has demonstrated by a preponderance of the

9   evidence that 310 kilograms of cocaine was reasonably

10  foreseeable to him and personally overseen by him.

11       Second, I conclude that the firearm possession

12  enhancement applies.  The Second Circuit recently emphasized

13  that for this two-level enhancement to apply, the firearms

14  possession only needs to have been reasonably foreseeable to

15  the defendant.  That was in *United States v. Batista*, 684 F.3d

16  333 at 343.

17       This means that the defendant himself does not need to

18  have personally possessed or even constructively possessed the

19  firearm.  *Batista* explained that the enhancement applies as

20  long as one member of the conspiracy possessed the firearm in

21  furtherance of this scheme and that such possession was

22  reasonably foreseeable to the defendant.  Based on the evidence

23  presented at the Fatico hearing I conclude that the standard

24  was met.

25       We heard testimony both from Mr. Diaz and another

1   cooperating witness who testified under the pseudonym

2   Carlos Garcia, that Mr. Rodriguez-Diaz obtained a handgun over

3   the course of the conspiracy and hid the handgun primarily at

4   the warehouse.  Mr. Diaz further testified that the reason

5   Mr. Rodriguez-Diaz obtained this handgun was out of concern

6   that others might rob them of the cocaine.

7           The Court recognizes that there were some

8   inconsistencies between Mr. Diaz and Mr. Garcia's testimony —

9   specifically, with regard to the details of when Mr. Garcia

10  first saw the handgun.  The Court finds, however, that these

11  inconsistencies were relatively minor and were not sufficient

12  to overcome the overall credibility of both witnesses or their

13  repetitive testimony about the handgun.

14          In any event, even if the Court were to disregard the

15  cooperator testimony about the gun, the government has still

16  demonstrated by a preponderance of the evidence that the

17  firearms possession was reasonably foreseeable to

18  Rodriguez-Diaz.

19          We heard testimony from Officer Jorge Villa that on

20  March 12, 2021, he helped search the Sweet Produce warehouse

21  and found a handgun in a small storage area.  The storage area

22  was located in the same building where Mr. Rodriguez-Diaz

23  direct the unloading and further distribution of the cocaine

24  shipments as described by Mr. Diaz and Mr. Garcia.

25          The district court in *Batista* explained that physical

proximity between the gun and the drug trafficking activity is

"one of the most clearcut methods" of demonstrating a firearm

was reasonably foreseeable to the defendant.  That's the

district court decision in *Batista*, 732 F.Supp. 2d at 97.

Furthermore, guns are a recognized tool of the drug

trade.  That's *Batista* at 343.  And we heard testimony from

Mr. Diaz that Mr. Rodriguez-Diaz had been smuggling cocaine

into the United States for around five years.  Thus, given

Mr. Rodriguez-Diaz's experience in the drug trade as well as

his control over the warehouse operations on a day-to-day

basis, it was reasonably foreseeable to him that a gun would be

kept on the premises, even if that gun wasn't personally

possessed by him.

Third, I find that the defendant maintained a premise

for distributing cocaine.  The Second Circuit has made clear

that controlling access or activities to the premise is enough

for the enhancement to apply.  Even if the defendant did not

have a possessory intent.  For example, in *United States v.*

*Holly*, 638 F.Appx 93, the defendant had unrestricted access to

the apartment where the drugs were stored, even though he did

not necessarily own or rent the apartment.

Similarly, although Mr. Rodriguez-Diaz did not own the

Sweet Produce warehouse in name, the government presented

sufficient evidence that he had full control over its

activities.  Mr. Diaz and Mr. Garcia both testified that the

1    warehouse operated completely under Mr. Rodriguez-Diaz's

2    direction, including both the produce front and the drug

3    trafficking activities.

4         Both witnesses also testified that Mr. Rodriguez-Diaz

5    held the keys to the warehouse.  He had access at any time of

6    day, and he was, for all functional purposes, the boss of the

7    premises.  The government has thus demonstrated by a

8    preponderance of the evidence that Mr. Rodriguez-Diaz

9    maintained the warehouse for the purpose of distributing

10   cocaine.

11        Fourth, I find the defendant's role in this conspiracy

12   was that of an organizer or leader.  Comment 423B1.1 lists

13   factors to consider when deciding if a defendant had a

14   leadership role.  Those factors include, among other things,

15   the exercise of decision-making authority, recruitment of

16   accomplices, degree of participation and planning or organizing

17   the offense, and the degree of control and authority exercised

18   over others.

19        Mr. Rodriguez-Diaz argues that he was only a minor

20   participant in the conspiracy, but the evidence presented at

21   the Fatico hearing indicate otherwise.

22        Mr. Diaz testified that when he met Mr. Rodriguez-Diaz

23   in 2016 in the Dominican Republic, Mr. Rodriguez-Diaz talked to

24   him about importing cocaine into the United States.  Mr. Diaz

25   subsequently introduced Mr. Rodriguez-Diaz to a supplier for

1    which Mr. Diaz received a commission.

2           Mr. Garcia further testified that in 2019,

3    Mr. Rodriguez-Diaz asked him if he wanted to work for the

4    Sweet Produce company, and Mr. Garcia subsequently became

5    involved in the drug conspiracy.

6           This shows that Mr. Rodriguez-Diaz played a primary

7    role in both initiating this scheme and recruiting accomplices.

8           Between Mr. Diaz and Mr. Garcia, we also heard

9    consistent testimony that Mr. Rodriguez-Diaz set the drug

10   prices, that he traveled back and forth between the

11   United States and the Dominican Republic to oversee the

12   packaging of the cocaine, and that he was the only person who

13   knew which liquid sugar pallets contained cocaine when they

14   arrived at the warehouse.

15          We heard that Mr. Rodriguez-Diaz instructed his

16   girlfriend and gave her the necessary funds to place the order

17   for each cocaine shipment.  And as I've already mentioned, we

18   heard that Mr. Rodriguez-Diaz controlled everything that

19   happened at the warehouse.

20          This shows that he exercised a degree of

21   decision-making authority, a high degree of control over

22   coconspirators, and overall was the linchpin of this

23   conspiracy's operations.

24          Again I found this testimony to be credible, and I

25   conclude that the government has demonstrated by a

1    preponderance of the evidence that Mr. Rodriguez-Diaz was an

2    organizer and leader of this scheme.

3            As a result of those findings, Mr. Rodriguez-Diaz is

4    not safety valve eligible pursuant to 18 United States Code

5    Section 3553(f).  The statute sets forth five criteria for

6    safety valve eligibility.

7            One of those is that the defendant did not possess a

8    firearm or other dangerous weapon or induce another participant

9    to do so in connection with the offense.  Another criteria is

10   the defendant was not an organizer, leader, manager, or

11   supervisor of others in the offense.

12           Now, I understand that the defendant contests whether

13   the standard for possessing a firearm in the context of safety

14   valve eligibility is the same as the standard for the firearm

15   enhancement, but I need not decide that today because either

16   way, I have found that he is a leader or organizer in this

17   offense, and I don't need to rely on the firearm possession to

18   conclude that he is not safety valve eligible.

19           So with those findings, I'm ready to proceed to

20   sentencing.

21           In connection with today's proceeding, I've reviewed

22   the following submissions:

23           The presentence investigation report that was last

24   advised as of October 14, 2022; Mr. Rodriguez-Diaz's sentencing

25   memorandum dated October 26, 2022, with accompanying exhibits.

1    And then I received supplemental letters on January 10 and

2    January 16.  I then have the government's sentencing memorandum

3    dated November 2nd, with supplemental letters, December 21 and

4    January 16.  I also received letters regarding sealing of

5    various items.

6              Have the parties received each of these submissions,

7    and am I missing anything?

8              MS. KUDLA:  Nothing from the government.

9              MR. CERIMELE:  No, your Honor.

10             THE COURT:  All right.  Thank you.

11             Why don't we begin by discussing the presentence

12   report?

13             Counsel, have you reviewed the presentence report and

14   discussed it with your client?

15             MR. CERIMELE:  Yes, your Honor.  We've reviewed it.

16   We discussed it with our client.  We made a number of

17   non-guidelines objections, which were incorporated into the

18   report, and we've made a number of guidelines objections, which

19   your Honor has just ruled on.

20             THE COURT:  Do you have any additional objections

21   other than the ones regarding the guidelines that I ruled on

22   that you want me to address today?

23             MR. CERIMELE:  No, your Honor.

24             THE COURT:  All right.  Thank you.

25             Mr. Rodriguez-Diaz, have you had enough time and

1    opportunity to review the presentence report and discuss it

2    with your attorney?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Okay.  Does the government have any

5    objections to the presentence report?

6              MS. KUDLA:  Your Honor, the government just has one

7    clarification that should be noted in PSR Paragraph 12.  There,

8    it just refers to a defendant's ex-wife as a CC1, and I think

9    in light of the later personal biography, I think it would be

10   better to say that Esnerlin Marcial Pena as a clarification.

11             THE COURT:  Do you want me to put the name in?

12             MS. KUDLA:  Yes.  I think that will help for

13   clarification for the record, so we should put that in.

14             THE COURT:  Can you spell that for the record, please?

15             MS. KUDLA:  E-S-N-E-R-L-I-N, M-A-R-C-I-A-L, P-E-N-A.

16   And that would be to Paragraph 12.

17             Your Honor, there are two points related to the

18   factual findings that that I wanted to clarify for the record

19   before we go forward.

20             THE COURT:  Please.

21             MS. KUDLA:  So the organizer and leader enhancement

22   under 3B1.1a, based on the Court's findings, and it seems

23   clear, that you have also found there were five or more

24   participants.  You had noted there was a supplier, Mr. Garcia,

25   Mr. Diaz, a girlfriend, and then people involved in the

1  packaging.  I just want to make sure the record is clear that

2  this conspiracy involved five or more participants.

3        THE COURT:  It did.  Thank you for that clarification.

4        MS. KUDLA:  And then the last item, and this was not a

5  contested guideline, but want to make sure all the parties are

6  aware that -- I think there was under 2D1.1b(16)(C), an

7  enhancement for the importation of -- directly involved in the

8  importation of cocaine, a plus-two enhancement.

9        THE COURT:  Yes.  I didn't get to that.  Yes, but

10 that's right.  So let's make sure that we're all on the same

11 page.

12       In light of my factual findings that were disputed at

13 the Fatico hearing, the guidelines calculation in the

14 presentence report is accurate; is that correct?

15       MS. KUDLA:  That is correct, your Honor.

16       THE COURT:  Okay.  And I agree with that.  And I agree

17 with the offense level computation on Page 9 of the presentence

18 report, and similarly find that Mr. Rodriguez-Diaz's base

19 offense level is 36.  That's in Paragraph 36.  He gets the

20 firearm enhancement, Paragraph 37.  That's two points.  He gets

21 the premise enhancement.  That's two points.  That's

22 Paragraph 38.  He gets the aggravating role enhancement that we

23 just discussed about, the importation of cocaine.  That's two

24 points.  That's Paragraph 39.  And then he gets the four-point

25 role adjustment, and that resulted in an adjusted offense level

1    of 46.

2            In light of the fact that I am not granting the

3    obstruction enhancement, I understand that there's no objection

4    to the three points off for acceptance of responsibility; is

5    that correct?

6            MS. KUDLA:  Your Honor, one moment.

7            (Counsel confer)

8            MS. KUDLA:  Your Honor, the reason we're hesitating is

9    we do not dispute the two-point reduction.  The question is

10   whether there would be a further one-point reduction about the

11   intention of entering a plea and assisting authorities.  I

12   think the larger point too, in light of the instruction, is

13   Mr. Rodriguez-Diaz has taken various positions with the

14   presentence report that seems to mitigate his role in this

15   offense, which are directly contradicted by his proffer

16   statements and by what the Fatico evidence was at trial.  And

17   in light of that, we don't feel that he is fully taking

18   acceptance of responsibility.  But what we can do, your Honor,

19   is rather than contest that point on a guideline --

20           THE COURT:  3553(a) factors?

21           MS. KUDLA:  Exactly.  I think that's the best way to

22   do it.  So there's no objection to --

23           THE COURT:  And that was the approach that I intended

24   to take as well, is to grant the three acceptance points, but

25   consider whatever arguments you'd like to make in that respect.

1    And so then that leaves us with a total offense level of 43.

2           And in any event, as you well know, obviously, it's

3    not affecting what the guidelines are.  So the guidelines have

4    a sentence of life and then, of course, there's the statutory

5    mandatory ten-year mandatory minimum.

6           Okay.  With all that said, I'll note for the record --

7    and I know Mr. Rodriguez is well aware of the sentence

8    guidelines.  We've talked about them in a number of different

9    contexts here.  At one time, they were mandatory, meaning

10   judges were required to follow the guidelines.  They're no

11   longer mandatory, but judges must nevertheless consider the

12   guidelines when considering an appropriate sentence.

13          So with all that said, why don't I hear from the

14   parties?  I understand that Mr. Rodriguez-Diaz is seeking a

15   variance.  I will note the probation department recommended a

16   variance of 120 months -- to 120 months, but why don't I hear

17   from the government?

18          MS. KUDLA:  Your Honor, one note on the probation's

19   variance, at the time that probation had to provide its

20   recommendation to the Court, it was not aware of the evidence

21   that would come forth at the Fatico hearing.  So I think that

22   that recommendation has to be taken in that light.

23          I think the government, after the full investigation

24   in procedural posture of this case in arriving today, still

25   believes that 240 months is still an appropriate sentence for

1    Mr. Rodriguez-Diaz, even though the Court is not taking into

2    consideration the obstruction of justice charge.

3          And that is on two factors, the scope and the nature

4    of this conspiracy; the second factor being

5    Mr. Rodriguez-Diaz's central role in this conspiracy.  And then

6    a third factor, your Honor, and perhaps most importantly,

7    because it reflects on deterrence in the future, is his ability

8    to accept responsibility for this wrongful conduct, to have

9    some type of self-reflection for how this conduct has impacted

10   others in going forward.  And I think it leaves a serious risk

11   of recidivism if a substantial sentence is not imposed here.

12          I think the evidence has been put forward at the

13   Fatico hearing and throughout the course of the pendency of

14   this case establishes that, for a period of years,

15   Mr. Rodriguez-Diaz was at the center of a large-scale cocaine

16   importation conspiracy into this country.

17          Between just 2019 and 2021, we have already found more

18   than 300 kilos of cocaine were imported into the United States

19   from the Dominican Republic.  That cocaine only had one place

20   to go:  It's the streets of New York, it's the streets of

21   New Jersey, and the impact on the neighborhoods and the

22   communities, both in terms of the individuals living there, the

23   small businesses, the affect of addiction, this can't be

24   minimized in any way.  And this isn't someone who is selling

25   drugs on a street corner for dime bags.  This is someone at the

1    top of the organization who is leading the importation into

2    this country, a key factor that makes narcotics trafficking

3    profitable and continues in the future.

4            And that was Mr. Rodriguez-Diaz's role.  And I think

5    for 3553(a) factors, it is important to note in the factual

6    finding also stated by the Court, that this didn't start in

7    2019.  Mr. Rodriguez-Diaz was introduced to Mr. Diaz as someone

8    who could import cocaine into the United States successfully as

9    early as 2016, and he did so on evidence on the record with at

10   least 40 kilos of cocaine at that point in time.

11           He then immigrated to the United States where he then

12   expanded that operation, and I think what you saw in evidence

13   supported by the cooperator's testimony was a CPB record,

14   statements from Caribbean Liquid Sugar.  If they were called to

15   testify, they would have said that they began receiving orders

16   in 2017 into 2018.  This was before the charged conspiracy.

17   And those records match CPB shipments as well.  And they also

18   match Mr. Rodriguez-Diaz's travel records into the

19   Dominican Republic.

20           So this conspiracy goes beyond even just the 300 kilos

21   that we're looking at here.  But it should be considered on the

22   characteristics of the defendant.  And then, your Honor, I

23   think the issue of the gun also adds to the serious nature of

24   this offense.  It takes the risk that is involved, not only to

25   the neighborhoods and the communities from the drug addiction

1    itself, but now also to the risk that we all know is readily

2    apparent in narcotic's trafficking.  And this all combines to

3    the fact that, based on his role, the nature of the offense,

4    that a substantial sentence is warranted.

5            But getting to that third point I mentioned.  Your

6    Honor, in terms of the acceptance of responsibility and our

7    concern about whether or not this defendant would reoffend in

8    the future, that is one of the largest concerns here.  He is at

9    the center of the conspiracy.  He is presented to the Court as

10   someone who is a caring and loving father, yet the facts

11   reflect that his ex-girlfriend, who currently is the sole

12   caretaker of two of his children, was one of the individuals

13   directly involved in this conspiracy.  If you care about your

14   kid, you don't turn to the mother to have her directly

15   participate in this conspiracy in this way.

16           He then turned to another girlfriend, his

17   coconspirator, Ironellys Paulino-Nolaso, to open the warehouse.

18   We know that was his idea based on the fact he had been doing

19   this for a while before.

20           He is turning to other people in his life who

21   supposedly he cares about, to engage them in drug trafficking

22   and narcotics trafficking.  This is a person who is not

23   reflecting on how his actions are impacting those around him,

24   including his children.

25           And then in light of him taking responsibility for

1    these crimes, it is very concerning to the government that the

2    statements he made to probation just are completely

3    inconsistent with all facts, including his own statements.  He

4    told probation he was used by coworkers to complete the task of

5    loading and unloading shipments, and he was unaware of the

6    amount of drugs he was handling.

7         The proffer statements, which he has now put at issue,

8    he knew the shipments contained a hundred grams of cocaine.  He

9    knew where to find the cocaine because it had the coordinates.

10   He directed the cocaine to go the bar.  These were all

11   corroborated by the cooperative statements as well, and also he

12   got paid a particular amount per kilo shipment.  It's just not

13   logical he would not have any idea how much cocaine was going

14   through there or that he never saw the cocaine.

15        These statements to probation, when he knew he had to

16   be truthful and he had to say everything truthfully to

17   probation show that he's just not taking responsibility, and

18   that is one of the largest concerns that we have here.  And

19   that is why the government is consistent with its

20   recommendation that 240 months is appropriate.

21        If the Court has any questions, we're happy to

22   address.

23        THE COURT:  I don't think so.  Thank you.

24        Counsel, whenever you're ready.

25        MR. KLINGEMAN:  Good morning, your Honor.

1    Henry Klingeman for Adriano Rodriguez-Diaz.

2          Two things, at the outset.  We ask the Court,

3    respectfully, to impose a sentence no greater than the

4    120 months mandatory minimum for reasons I'll discuss.

5          It's consistent with the probation recommendation, and

6    I will note that the probation recommendation was based on the

7    same guidelines findings that your Honor has adopted today.

8          The probation accepted the government's advocacy at

9    the presentence level and subsequently made the recommendation

10   for 120 months.  So we'd ask the Court to adopt that and impose

11   that sentence.

12         I want to briefly respond to the government's opening

13   salvo regarding the war on drugs.  I stood in counsel's

14   position 25 years ago and made the same arguments.  And if our

15   laws and policies don't change, her successor is going to stand

16   here 25 years from now making the same arguments.

17         Mr. Rodriguez-Diaz is an impoverished Dominican who

18   made a terrible choice to get involved in the drug trade.  That

19   doesn't make him responsible for polluting the neighborhoods of

20   New York.  That is a collective responsibility and a collective

21   failure that is way beyond the scope of this hearing.  But I

22   don't want that allegation to go unremarked upon.

23         Let's talk about the 3553(a) factors.

24         Mr. Rodriguez-Diaz is, indeed, the father of four

25   children about whom he cares deeply, and obviously he'll be

1    able to speak to that far more meaningfully than I can.  He's

2    also from an extended family of siblings.  His, what I'll refer

3    to as, stepparents are deeply important to him.  He does not

4    know his birth parents.  It's another part of his origin story

5    that perhaps led him to this place.  But in any event, he's

6    grown up in an entirely disadvantaged manner, and yet has

7    managed to maintain these family relationships.

8            As to whether he's involved other family members in

9    his activities, that's unproven, certainly uncharged, and I'd

10   ask the Court to weigh it against Mr. Rodriguez-Diaz's obvious

11   family affiliations.

12           I mentioned that he grew up poor.  Again, that's

13   something he can address far more meaningfully than I can.  But

14   for someone to grow up without sufficient food and with no

15   education is something that is just hard, for me, at least, to

16   comprehend, how he persevered and survived.  And, frankly, he

17   didn't survive, in fact, and he finds himself here facing, at a

18   minimum, ten years in federal prison in a foreign country.  So

19   he has definitely not had the kind of advantages or

20   opportunities that we would like to afford our fellow man.

21           In addition, he has a kind of cognitive disability.

22   It's been diagnosed by doctors in the Dominican Republic as

23   early stage Alzheimers.  I'm not a medical expert.  We were not

24   able to put forward an authoritative diagnosis.  But clearly as

25   a result of some trauma he suffered in a car accident or other

1   medical causes, he has cognitive difficulties that will

2   apparently persist through his early-middle age and into his

3   old age.

4          We noted in our sentencing memo that he was detained

5   or had been detained through the COVID pandemic.  The

6   conditions at the Essex County Jail, where he spent most of his

7   pretrial detention, were not healthy in any way, shape, or

8   form; not conducive to rehabilitation, certainly; and, of

9   course, he was moved here in light of the accelerated court

10  proceedings last fall.  Nevertheless, he's managed to

11  participate in programs in custody.

12         This morning, he provided me with six certificates --

13  excuse me, seven certificates that he's received since he's

14  been in New York at MDC Brooklyn in various skills and

15  vocational programs involving bookkeeping, budgets and

16  financial reports, business acumen, commercial driver's license

17  test prep program, developing creative skills, developing

18  marketing skills, and other skills that he could use when and

19  if he's given the opportunity to obtain a legitimate

20  employment, presumably upon his release from custody.  So he's

21  showing initiative while in custody to, as the government says,

22  reflect upon his life, and apparently is trying to make

23  improvements so that he can reintegrate himself.

24         Finally, with respect to acceptance of responsibility,

25  Mr. Rodriguez-Diaz, in an unusual fashion, has already

1  addressed this Court on the issue of acceptance and

2  responsibility.

3        As your Honor may recall in July of 2022, about seven

4  months ago, he stood before the Court, I stood next to him, and

5  he addressed the Court directly.  And he said he was prepared

6  to plead guilty.  He was willing to accept responsibility for

7  his conduct.  But what he didn't want to accept responsibility

8  for was the conduct of others.  And your Honor recited the

9  legal principles around conspiracy and around the various

10 enhancements, and I don't fault Mr. Rodriguez-Diaz for not

11 understanding the full nuances, if I can call them that, to a

12 layperson, of the law around these issues.

13       But what he's essentially saying, your Honor, is judge

14 me on what I did, not on what others did.  And that's a

15 fundamental human instinct when we're being judged.  And I

16 understand that, and I hope the Court understands that, but he

17 certainly, unfailingly, has accepted responsibility.  In a

18 sense, he came forward early on, he proffered to the

19 government, it was unsuccessful, but he admitted his

20 involvement in the cocaine importation conspiracy and

21 distribution here in the United States.  He never wavered,

22 never hesitated.

23       But what he denied is knowing about the gun.  Well,

24 maybe he didn't know about the gun.  But as your Honor has

25 pointed out, the law in the circuit is if the gun is reasonably

1   foreseeable, then the gun is his responsibility as much as any

2   other member of the conspiracy.  It doesn't mean he knew about

3   the gun, subjectively.  It just means that he's responsible for

4   the gun.

5        I'm not minimizing his conduct.  I'm not minimizing

6   the scope of his activity.  I just want his acceptance of

7   responsibility to be placed in the proper context.  And, of

8   course, I think his early and often repetition of his

9   acceptance of responsibility is evidence of its credibility.

10       So those are the nature and characteristics of the

11  offender.

12       Going to the next factor, the need for the sentence to

13  reflect the seriousness of the offense.  We're talking about a

14  life sentence guidelines advisory -- advisory guideline range.

15  It's hard to imagine that any sentence your Honor chooses to

16  impose, including the mandatory minimum of 10 years, would fail

17  to reflect the seriousness of this conduct.  So I'm not going

18  to belabor that.

19       The need for this sentence to afford adequate

20  deterrence, that factor goes to general deterrence.  I, again,

21  I'm not going to quarrel with the government's --

22       THE COURT:  I think it goes to general and specific,

23  and I think the government is making the argument with respect

24  to the specific deterrence as well, but please proceed.

25       MR. KLINGEMAN:  That was the next factor, I will

1    address specific deterrence.  I will get to that in a moment.

2    But in terms of general deterrence, I don't think this sentence

3    is going to have an impact on general deterrence for reasons I

4    opened with.

5            Having said that, the need for this sentence to

6    provide specific deterrence and to protect the public,

7    presumably, as the government expressed its concern, from

8    Mr. Rodriguez going forward, given his age, the fact he's in

9    his 40s and the fact he will not leave prison for a minimum of

10   a decade, all in, subject to good time and obviously credit

11   since he's been arrested, studies show the recidivism rate of

12   someone his age, or the age he will be, in his early 50s, is in

13   the single digits.  And the fact he's going to be removed from

14   the United States doesn't necessarily not make it our problem

15   anymore.  We have to obviously concern ourselves about

16   returning dangerous criminals to their home countries with whom

17   we have friendly relationships.

18           Having said that, I think your Honor can conclude

19   fairly that the specific deterrence afforded by a 10-year

20   sentence will be adequate to the purpose.

21           And then the need for the sentence to provide the

22   defendant with a needed education or vocational training,

23   medical care, et cetera.  Obviously, we count on the Bureau of

24   Prison to deliver those services.  Whether they do in every

25   case is actually case dependent.  But here, of course,

1  Mr. Rodriguez-Diaz has already sought at MDC to engage in

2  vocational and other skills training, and we expect him to do

3  the same wherever he's designated.

4        And with respect to medical care, I would hope that

5  the people who receive him, wherever he is, will take into

6  account whatever cognitive issues he's got and deal with them

7  as they're supposed to under law.

8        Family, and probably most significant in this

9  particular situation, is the need to avoid unwarranted

10  sentencing disparities.  So far as I can tell, there may be a

11  fugitive in this case.  I don't know if he's been charged.  But

12  a person who the law enforcement arrested and then released is

13  gone.  I don't know anything about him.  But I do know that

14  there are three other defendants who have been prosecuted, two

15  of whom testified before your Honor.  I'll say very little

16  about them other than I don't believe they're in custody, and

17  if they are, I'm not aware of what specific sentence they've

18  gotten.  But I'm confident that those sentences are

19  dramatically lower than ten years.

20        The only person I have real knowledge about, the

21  codefendant, Ms. Ironellys Nolasco, who received a sentence of

22  time served at the time she was sentenced by your Honor.  She

23  did approximately 18 months in custody, as I understand it.

24  She was subject to the same guidelines calculation as

25  Mr. Rodriguez-Diaz, a similar type of guidelines calculation

1   based on a plea agreement that she had.  We didn't have a plea

2   agreement.  But she was level 43.

3          She, of course, got a safety valve -- she was safety

4   valve eligible based on her proffer and other factors that

5   Mr. Rodriguez-Diaz is not qualified for based on the Court's

6   rulings.  But nevertheless, she starts out sky high the way he

7   has, but probation similarly recommended for her a sentence of

8   120 months, evidently subject to the safety valve.  And then

9   the government, I believe, asked for 96 months at sentencing,

10  and your Honor gave the sentence that your Honor gave.

11         We'd ask that the sentence of 120 months, which is the

12  minimum that your Honor can impose here, is more than

13  sufficient, but certainly it's six times the sentence that

14  Mr. Rodriguez-Diaz is eligible at a minimum level, maybe five

15  times.  My math is rough.  But to avoid that disparity, I would

16  ask your Honor to please consider the sentences imposed on the

17  other defendants.

18         So the final point, of course, is that

19  Mr. Rodriguez-Diaz is here, initially as a legal visitor to the

20  United States.  Now, he will no longer be considered a legal

21  visitor and be removed.  So I would ask the Court, finally, to

22  take that into account and impose the 120 months.

23         Thank you.

24         THE COURT:  Thank you.

25         Mr. Rodriguez-Diaz, I read your letter, but is there

1  anything else you'd like to say today?

2         THE DEFENDANT:  Good morning.

3         THE COURT:  Good morning.

4         THE DEFENDANT:  I would like to thoroughly apologize.

5  I'd like to say I'm sorry to the U.S. Government, I'd like to

6  personally apologize to the judge, and I'd like to apologize to

7  my family, who hasn't arrived yet that are on their way here,

8  but they haven't arrived yet.  And I'd also like to apologize

9  to my family.

10        And I'd like to ask my family that, even though I

11 won't be there, that they will never see me again in a court.

12 I would like to say they'll never see me in any part of this

13 country.  I truly apologize.

14        Thank you.

15        THE COURT:  All right.  Thank you.

16        So I'm required to consider the advisory guidelines

17 range as well as other factors that are outlined in a provision

18 of the law that we've, of course, talked about.  It's

19 18 United States Code, Section 3553(a) and I've done so.

20        Those factors include but are not limited to:  The

21 nature and circumstance of the offense and the personal history

22 and characteristics of the defendant because every defendant

23 must be considered individually as a person.

24        Judges are also required to consider the need for the

25 sentence imposed to reflect the seriousness of the offense,

1    promote respect for the law, provide just punishment for the

2    offense, afford adequate deterrence to criminal conduct,

3    protect the public from future crimes of the defendant, and

4    avoid unwarranted sentencing disparities, among other things.

5         So I don't think there's a dispute as to the

6    seriousness of the offense.  This was a very sophisticated,

7    large scale cocaine importation and distribution enterprise

8    that resulted in the DEA seizure of approximately 120 kilos of

9    cocaine, over a million dollars in cash, and a firearm.  And

10   Mr. Rodriguez-Diaz participated for at least five years and

11   imported hundreds of kilos of cocaine.

12        Drugs like this cause real harm to real people.  And

13   to counsel's point, Mr. Rodriguez-Diaz is not alone responsible

14   for the harm to various communities, but he was a part of it.

15   And drugs like these, they destroy neighborhoods, they fuel

16   addiction, they spawn violence, they destroy people and

17   communities, and that harm is real, and he contributed to that

18   harm.

19        Now, the government disputes the degree to which

20   Mr. Rodriguez is accepting responsibility for this conduct.  He

21   has admitted his conduct, but he has -- he's admitted his

22   participation in this conspiracy, but he's disputed a number of

23   different factual assertions.

24        As I already noted, he was involved in this conspiracy

25   for years, and he played a very significant role.  He

1    communicated with the cocaine supplier.  He placed orders of

2    liquid sugar through the liquid sugar companies and cash for

3    money orders, used fake identities to avoid detection, traveled

4    to the Dominican Republic to oversee the packaging, directed

5    that the cocaine be transported for further distribution, and

6    set the sale price.  So he was, as I already found, an

7    organizer/leader in this conspiracy and played a really

8    important role in it.

9         And so the sentence needs to promote respect for the

10   law, to protect the public against future crimes of the

11   defendant, afford deterrence, both general and specific, and it

12   must do so.

13        As I already noted, have to consider unwarranted

14   sentencing disparities.  As counsel rightly noted, the only

15   defendant I've sentenced to date in this case is

16   Ironellys Paulino-Nolaso, who received a sentence of time

17   served, which was about 18 months.  There were very specific

18   reasons I did that in that case, and we can turn back to the

19   transcript of that case.  But she was eligible for safety valve

20   treatment, and she played a role that was relatively minor, at

21   least in comparison to Mr. Rodriguez-Diaz.

22        I've considered those factors.  I've also considered

23   other personal factors to Mr. Rodriguez-Diaz.  At the age of

24   43, he has no other criminal history.  He has four children.

25   I've read the letters from family members.  I have read about

1    his difficult upbringing in the Dominican Republic, growing up

2    in poverty, in an overcrowded household and lacking food and

3    education, and suffering from a head injury.  I've read about

4    the health conditions he -- or doctors in the

5    Dominican Republic have said have followed.

6           And I've considered the harsh conditions of

7    confinement, particularly the pandemic.  And I think this is

8    really real.  I think it makes time so much harder to do.  And

9    I've considered that.  I've also considered the fact he will

10   likely spend additional time in ICE custody, awaiting

11   deportation to the Dominican Republic.

12          So I've considered that, and I'm ready to impose

13   sentence.  And I'm not going to consider the alleged

14   obstruction of justice, but I am ready to impose sentence.

15          So could you please stand, Mr. Rodriguez-Diaz?

16          It's the judgment of this Court that you be committed

17   to the custody of the Bureau of Prisons for a term of

18   120 months to be followed by a term of supervised release of

19   five years.  And I believe that this sentence is sufficient but

20   not greater than necessary to comply with the purposes of

21   sentencing set forth in the law.

22          You can be seated now.

23          I want to say a few things, and then I'm going to read

24   all the conditions of supervised release and other aspects of

25   the sentence.

1          Number One, I think ten years is a really long

2     sentence, and I think we sometimes in court, we have to remind

3     ourselves of how long 10 years is in an individual's life.  And

4     so even though this was the mandatory minimum, this is a very

5     long sentence, and I just want that to hit home.

6          I think Mr. Rodriguez-Diaz deserves a very significant

7     sentence for his conduct, but I also think this is a very

8     significant sentence, and I don't want anyone to lose sight of

9     that.  That's one thing I wanted to say.

10          I wanted to say that had I relied on the obstruction

11     of justice allegations, I would have given a more severe

12     sentence because I do take that very seriously.  And I wanted

13     to be clear that if anyone tries to dissuade people from

14     testifying, getting them to change their testimony, threatening

15     them, that it's important to prevent other people from doing so

16     and say your sentence will be more significant because of that.

17     So I want to note that.  But, again, I didn't rely on those

18     allegations for the reasons that I stated earlier.

19          Okay.  So with all that said, I'm going to read the

20     conditions of supervised release.

21          So all the standard conditions of supervised release

22     that are on Pages 29 and 30 of the presentence report shall be

23     imposed.

24          Counsel, would you like me to read those out loud, or

25     do you waive their public reading?

1            MR. KLINGEMAN:  We waive.

2            THE COURT:  Please make sure you go over them

3    carefully with Mr. Rodriguez-Diaz.

4            I am going to read the mandatory conditions.

5            He must not commit another federal, state, or local

6    crime.  You must not unlawfully possess a controlled substance.

7    You must refrain from any unlawful use of a controlled

8    substance.  You must submit to one drug test within 15 days of

9    release from imprisonment, and at least two periodic drug tests

10   thereafter determined by the Court, and you must cooperate in

11   the collection of DNA as directed by the probation officer.

12           In addition, in light of the nature of the crime at

13   issue here and the circumstances in which it was carried out, I

14   am imposing the first special condition recommended by the

15   probation department, that you shall submit your person and any

16   property, residence, vehicle, papers, computer, other

17   electronic communication, data storage devices, Cloud storage

18   and media, and affects to a search by any United States

19   Probation Office, and, if needed, with the assistance of law

20   enforcement.  The search is to be conducted when there's a

21   reasonable suspicion concerning a violation of a condition of

22   supervision or unlawful conduct by the person being supervised.

23           Failure to submit to a search may be grounds for

24   revocation of release.  You shall warn any other occupants that

25   the premises may be subject to a search pursuant to this

1    condition.  Any search shall be conducted at a reasonable time

2    and in a reasonable manner.

3          Mr. Rodriguez-Diaz will be supervised in the district

4    of his residence, to the extent he's still here.  Some of these

5    may be -- all the supervised release conditions may be mooted

6    to the extent he's deported, of course.

7          I want to hear the parties' thoughts on the second

8    recommendation made by the probation department, which reads

9    that if the probation officer determines based on your criminal

10   record, personal history, or characteristics, that you pose a

11   risk to another person, including an organization, the

12   probation officer with the prior approval of the Court may

13   require you to notify the person about the risk and must comply

14   with that instruction.  The probation officer may contact the

15   person and confirm you have notified the person about your

16   risk.  That's on Page 30.

17         Do the parties have any thoughts on that?  If there's

18   no objection, I'll impose it.

19         MR. CERIMELE:  Your Honor, we would object to the

20   condition for no other reason than defendant is going to be in

21   custody.  I'm not sure how probation would characterize him as

22   a risk to another person under those circumstances.  I think it

23   would be a difficult condition to enforce, so we would object

24   to that.

25         THE COURT:  To be honest, I haven't seen this

1    condition before.  I assume if there was someone in particular

2    who was at risk, the probation department would ask permission,

3    and I would, of course, notify the person.  I'm happy to hear

4    the government out.

5         MS. KUDLA:  Your Honor, I think that we have seen this

6    condition before.  It's not coming into effect while he's in

7    custody.

8         THE COURT:  Of course.  It's when he's on supervised

9    release.  I recognize that.

10        MS. KUDLA:  And I think the issue here is, recognizing

11   that we have not relied on the obstruction of justice, I think

12   the Court can see that the witnesses testifying were terrified

13   in this case.  And, in fact, the government did have to move a

14   witness and their family as a result of certain conduct here.

15        So I do think the condition is appropriate.  And all

16   it requires is notification to the Court if this risk occurs,

17   and then it would be allowed to notify that person.  This is a

18   de minimis amount of involvement on the defendant.  And in

19   light of the circumstances of this case, and just based on the

20   appearance of the witnesses testifying, it does seem like it

21   would be warranted despite the --

22        THE COURT:  Who's the "you" in this?  So if the

23   probation officer determines, based on your Criminal History

24   Category — so that's the defendant — personal history or

25   characteristics that you pose a risk to another person,

1   including an organization, and the probation officer, with

2   prior approval of the Court, may require you to notify the

3   person about the risk, and you must comply with that

4   instruction -- it's not clear to me what the instruction is and

5   why we would want Mr. Rodriguez-Diaz's notifying someone about

6   the risk as opposed to the probation officer.  I'm just a

7   little confused by the way it's written.  I know the government

8   attorneys didn't write this, but I'm a little bit confused.

9          MS. KUDLA:  Your Honor, my colleague, Ms. Steiner, has

10  more experience.

11         THE COURT:  Please.

12         MS. STEINER:  I have seen this special condition

13  proposed in at least one other case.  I think typically, and,

14  again, I don't want to speak fully on behalf of probation, but

15  the thinking behind it is, for example, if the defendant were

16  to apply for certain employment, probation could -- and they

17  thought certain individuals in that environment could be put at

18  risk, potentially being recruited by the defendant or having

19  their facility used by the defendant for ill purposes, the

20  probation office, as a precaution, could require the defendant

21  to notify those in his environs that he has this particular

22  criminal history.

23         Again, it's a precaution I think that is warranted,

24  given the fact that in this particular case, you've seen this

25  defendant has affected a great deal of influence on those who

1   he has worked with and associated with in his immediate

2   environment, and I would expect that that is the thinking

3   behind probation's request here.

4            THE COURT:  Okay.

5            MR. KLINGEMAN:  Your Honor, I wanted to make precisely

6   the point your Honor was getting to.  If the allegation that

7   Mr. Rodriguez-Diaz has threatened people, he should not be the

8   one reaching out to those people to say, hi, I'm out of prison,

9   and I'm in your neighborhood.  I think what ought to happen is

10  probation ought to have the authority to say to

11  Mr. Rodriguez-Diaz on supervised release, have no contact with

12  people X, Y, and Z, and direct him not to contact those people.

13  And if the Court sees fit, it's also appropriate for probation

14  to contact those people, X, Y, and Z, and by the way,

15  Mr. Rodriguez-Diaz has been released from custody and he's

16  living in such and such area.

17           I think those are entirely reasonable to keep -- it's

18  a prophylactic matter to keep Mr. Rodriguez-Diaz out of

19  trouble, and it also serves the purpose of warning people who

20  may have some concern.  But the idea that Mr. Rodriguez-Diaz is

21  supposed to reach out to these folks, I think, is

22  objectionable.

23           THE COURT:  I agree.  I'll tell you, I'm going to talk

24  to the probation department separately about this condition.  I

25  think it could be worded better if the intention is -- and I'm

1    sure the government is right as to what the intention is.  But

2    I think it could be worded a lot better.  I think it's

3    confusing.  I think it's lightly moot.  I think

4    Mr. Rodriguez-Diaz will be deported, so I'm not going to impose

5    it.

6              Let me say this, Mr. Rodriguez-Diaz, if I find out

7    that you have attempted to retaliate or threatened anyone in

8    any way, you're going to have a real problem.  And if it's on

9    supervised release, you should expect to go back to jail.  So I

10   want to make very clear, if there ever is a threat against

11   anybody or any efforts to retaliate against anyone in any way,

12   you should expect to -- while you're on supervised release,

13   expect to do more time.  So I want to make that clear.  But I

14   think the condition is not worded properly.  So I'm not going

15   to impose it for that reason.

16             I'm not going to impose a fine because the probation

17   department has reported that it would be difficult for

18   Mr. Rodriguez-Diaz to pay one.

19             I'm required to impose a mandatory special assessment

20   of $100, which shall be paid immediately.

21             What's the government's position with respect to

22   forfeiture or restitution?

23             MS. KUDLA:  Your Honor, there are no forfeiture

24   allegations.

25             THE COURT:  Okay.  And restitution is not appropriate

1   here.

2          Okay.  So does either counsel know of any legal reason

3   why this sentence I stated cannot be imposed?

4          MS. KUDLA:  None from the government.

5          MR. KLINGEMAN:  No, your Honor.

6          THE COURT:  So that's the sentence that will be

7   imposed, Mr. Rodriguez-Diaz.

8          You have a right to appeal your conviction and

9   sentence, except to whatever extent you may have validly waived

10  that right.  If you choose to appeal, the notice of appeal must

11  be filed within 14 days of the judgment of conviction.  If

12  you're not able to pay for the cost of an appeal, you may apply

13  for leave to appeal in forma pauperis, which simply means that

14  court costs and filing fees will be waived.  If you request,

15  the clerk of court will prepare and file a notice of appeal on

16  your behalf.

17         Are there any open counts that need to be dismissed?

18         MS. KUDLA:  Yes, your Honor.  At this time, the

19  government moves to dismiss Counts Two and Three.

20         THE COURT:  They will be dismissed.

21         Lastly I will just say what I often say at sentencing,

22  because I firmly believe it to be true:  I don't think people

23  need be defined by the worst mistakes they've ever made.  Look,

24  Mr. Rodriguez-Diaz, I've already found you engaged in really

25  serious criminal conduct, but you don't need to be defined by

1    that, but whether you are is going to be up to you.  The

2    question is, going forward in life, after you serve your time,

3    are you going to live your life in a law abiding and productive

4    way to make your children proud, or are you going to continue

5    in this conduct?  And that's going to be up to you to

6    determine.

7            I hope you make the right decision to move forward in

8    a more productive and law-abiding way and a way that you and

9    your family can be proud of, and I wish you luck with that.

10           I understand that there's a request that

11   Mr. Rodriguez-Diaz be housed at the facility in Pennsylvania;

12   is that correct?

13           MR. CERIMELE:  Yes, your Honor.

14           THE COURT:  Okay.  And you specifically want him at

15   that facility?  The Bureau of Prisons has a preference for

16   recommendations in areas as opposed to recommendations for a

17   specific facility.

18           MR. CERIMELE:  Mr. Rodriguez-Diaz just advised me he

19   would like to be housed at Fort Dix, if as at all possible.

20   That would be the closest to his house.

21           THE COURT:  I think what's most helpful if you tell me

22   closest to where, as opposed to the facility, where I think the

23   Bureau of Prisons is less likely to accept the recommendation,

24   but close to, just tell me where he wants to be closest to

25   geographically.

1          MR. CERIMELE:  I believe his last residence, Judge,

2    was Ridgewood, New Jersey --

3          THE COURT:  So I'll make that recommendation, as close

4    to Ridgewood, New Jersey, as possible.

5          Are there any other applications at this time?

6          MR. CERIMELE:  No, your Honor.

7          MS. KUDLA:  No, your Honor.

8          THE COURT:  Okay.  Thank you.  We are adjourned.

9          MR. KLINGEMAN:  Your Honor, may we approach with

10   counsel off the record briefly?

11         (Sidebar; discussion off the record)

12         (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25